QESTEC, INC., William P. Moulin, and Joseph W. Lawrence, Plaintiffs,

v.

Michael KRUMMENACKER, Defendant.

No. CIV.A.00–40107–NMG.

United States District Court, D. Massachusetts.

April 13, 2005.

Kurt L. Binder, Morrison, Mahoney & Miller, Yarmouthport, MA, Burton Chandler, Seder & Chandler, Worcester, MA, James J. Duane, III, Taylor, Duane, Barton & Gilman, Boston, MA, Lawrence Gingrow, Taylor, Duane, Barton & Gilman, Boston, MA, Robert S. White, Bourgeois, Dresser & White, Worcester, MA, for Plaintiffs.

Matthew E. Mitchell, Keegan, Werlin & Pabian, LLP, Boston, MA, for Michael J. Krummenacker, Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the instant case, plaintiffs Qestec, Inc. ("Qestec"), William P. Moulin ("Moulin") and Joseph W. Lawrence ("Lawrence") (collectively "the plaintiffs") and third-party defendant Kurt L. Binder ("Binder") are involved in a protracted corporate and contractual dispute with former director and shareholder, Michael Krummenacker ("Krummenacker"). Plaintiffs and Binder now move for summary judgment.

## I. *Factual Background*

Qestec is a Massachusetts corporation of which Moulin is the President, a director and stockholder, and Lawrence is the Treasurer, a director and stockholder. Binder is corporate counsel to Qestec. Krummenacker is a shareholder, as well as a former employee and director.

### A. The Sales Employment Agreement

On December 3, 1996, Krummenacker and Qestec executed a Sales Employment Agreement ("the SEA") whereby Krummenacker was hired as a Sales Executive. Qestec set up an office for Krummenacker near his home in Long Island, New York. At that time, Moulin and Lawrence owned all of Qestec's stock.

Paragraph 7 of the SEA is entitled "Agreement Not to Compete" and it provides that:

[i]n consideration of the Company's employment and continued employment of Sale Executive pursuant to this Agreement, Sales Executive agrees that during the term of this Agreement Sales Executive will not, engage directly or indirectly, in the sale, marketing, distribution or promotion of any goods that are competitive with the Products anywhere in the area included in this agreement.

Paragraph 9 of the SEA governs termination of the Agreement and provides, in part, that:

either party may terminate this Agreement without notice in the event that the other party fails to observe or perform any material obligation in this Agreement. A material breach of this Agreement by Sale Executive shall include, but is not limited to ... engaging in any unethical, immoral or unprofessional conduct ....

## B. The Cross Purchase Agreement

On July 20, 1998, Krummenacker purchased 25% of Qestec's stock (5,000 shares) for $25,000 and was made Vice President and a director of the company. At that time, Gregory Bitter ("Bitter") also purchased 25% of Qestec's stock and was made a director. As part of the transaction, Krummenacker and Bitter signed an amendment to a Cross Purchase Agreement ("the CPA") which outlined the responsibilities of the shareholders of Qestec.

Article V of the CPA, entitled "Termination of Employment", provides that:

[i]n the event that a Shareholder's employment with the Corporation is terminated for "Cause" (as defined herein), the other Shareholder shall purchase, and the terminated Shareholder shall sell and deliver to the other Shareholder, all the shares in the Corporation owned by the terminated Shareholder, at the purchase price specified in Paragraph C of Article VII of this Agreement . . . .

For purposes of this Article "Cause" shall mean the determination by the Board of Directors of the Corporation that any one or more of the following events had occurred: (i) willful misconduct or gross negligence of the Shareholder in connection with the performance of his duties; . . . .

## C. Qestec's Bylaws

On January 26, 1999, Qestec's four shareholder/directors adopted new Bylaws pursuant to an action by consent.

### 1. *Provisions Governing Actions by Directors*

Article III, § 14 lists several "core decisions" for which approval by a quorum of the Board of Directors is required. Included on the list is "any major personnel decisions including the hiring and firing of employees . . . amendment or termination of any employment contract . . . ." Article III, § 8 states that:

a majority of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may otherwise be specifically provided by statute . . . .

Article IV, § 2 provides that officers may be removed at any time by a vote of a majority of the Board of Directors.

### 2. *Provisions Governing Actions by Shareholders*

Shareholder meetings are governed by Article II of the Bylaws. Section 3 governs special meetings, stating that they:

may be called by the President and shall be called by the President or Clerk at the request in writing of a majority of the Board of Directors, or at the request in writing of stockholders owning a majority in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote.

Section 4 states that a quorum for the transaction of business at a meeting consists of "[t]he holders of a majority of the stock issued and outstanding and entitled to vote, present in person or represented by proxy".

Finally, § 5 provides that:

[w]hen a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes . . . a different vote is required.

## D. The Dispute

During the mid–1990s Krummenacker began dating Audra Perkins ("Perkins").

The two were soon engaged and Perkins moved into Krummenacker's apartment. In late 1996, they both became employed by Qestec and worked from the back room of a store owned by Krummenacker. At that time, the SEA was executed. In 1997, they moved into new office space which allowed them to have separate offices within a common space. In July 1998, the CPA was executed and Krummenacker became a shareholder and director of Qestec.

During July, 1997, while Krummenacker was working for Qestec, he incorporated Mia, Inc. ("Mia"), allegedly to import "African goods" for sale at a store he owned. Although neither party explains the details, it appears that between December 1997, and January, 1998, Mia bought and sold used computer parts, the same kind of business engaged in by Qestec. Plaintiffs allege that the "competition" amounted to a breach of the SEA. Krummenacker apparently does not dispute the allegation but states that he operated Mia in the relevant industry only during a brief period when Qestec's future was in question. He also states that he never sold products through Mia to his Qestec customers. Mia was dissolved on February, 3, 2003.

In mid–1999, the relationship between Krummenacker and Perkins soured. On February 12, 2000, Perkins moved out of Krummenacker's apartment and began dating Robert Gorsett ("Gorsett"), a soon-to-be employee of Qestec.

The breakup had an adverse impact upon the office environment. As described below, an arbitration panel found that Krummenacker created an unpleasant work environment for Perkins. He repeatedly accessed her computer to read her personal information, tracked her movements and attempted to delay Gorsett's pending relocation to Massachusetts.

Moulin and Lawrence became aware of the incidents and, on May 23, 2000, they sent Krummenacker a memorandum notifying him that he was suspended. On May 26, 2000, Krummenacker's counsel notified Moulin and Lawrence that the Suspension Notice was ineffective in absence of action by Qestec's Board of Directors.

On June 5, 2000, Moulin and Lawrence convened special stockholders and directors meetings, at 10:30 a.m. and 11:00 a.m. respectively, in Binder's office. The meetings were scheduled for a time during which Bitter, an ally of Krummenacker, would be arriving from out of state but it remains unclear whether plaintiffs' intention was to exclude him.

At 10:30 a.m., the stockholders meeting began with Moulin, Lawrence, Binder and Krummenacker present. Bitter had not arrived but Binder suggested that the meeting could go forward. A vote was immediately called on whether to remove Krummenacker as a director. Moulin and Lawrence voted in favor and Krummenacker against. The motion was carried and the meeting was closed.

The directors meeting followed. At that point, Bitter had arrived but he refused to enter the meeting because Binder would not allow him to be accompanied by counsel. Moulin and Lawrence then voted to remove Krummenacker as Vice President and to terminate his employment. They also voted to reduce the number of directors from four to three.

### E. Procedural History

Plaintiffs filed the instant action in state court on May 30, 2000. The complaint, in present form, seeks 1) a declaratory judgment that any dispute concerning the disciplinary actions taken by Qestec against Krummenacker must be resolved by arbitration (Count I), 2) an order compelling arbitration pursuant to M.G.L. c. 251 § 2 (Count II), 3) a declaratory judgment that Krummenacker is required to sell his Qes-

tec stock pursuant to the CPA (Count III), 4) damages for breach of the SEA (Count IV), 5) damages for breach of the implied covenant of good faith and fair dealing implied in the SEA (Count V), 6) rescission of the CPA (Count VI) and 7) damages for breach of fiduciary duty (Count VII).

The case was removed to this Court on June 22, 2000 and Krummenacker filed several counterclaims. Count I states a claim for declaratory judgment that the SEA was abandoned or rescinded. Counts II and III allege that Moulin and Lawrence, respectively, breached a duty of good faith and loyalty owed to Krummenacker as a shareholder by improperly terminating him from Qestec.

On September 6, 2001, this Court allowed Krummenacker to add Binder as a third-party defendant. Krummenacker states claims against him for breach of fiduciary duty (Count IV of counterclaim) and for aiding and abetting the breaches alleged of Moulin and Lawrence in Counts II and III (Count V of counterclaim).

On September 25, 2000, plaintiffs filed a demand for arbitration with the American Arbitration Association ("the AAA"). On September 7, 2001, this Court entered an Order stating that the SEA was biding upon the parties and submitting the issue of "whether defendant was properly terminated pursuant to the Sales Employment Agreement" to arbitration.

On June 11, 2004, the AAA announced its findings. It ruled that Krummenacker had been properly terminated as an employee because he was in breach of Section 9B of the SEA, which allowed for termination of the Agreement if the employee "engag[es] in any unethical, immoral or unprofessional conduct". The AAA found that the conduct of Krummenacker toward Perkins qualified.

On September 30, 2004, plaintiffs filed two motions for summary judgment. The first seeks summary judgment on Counts I–III of Krummenacker's counterclaim. The second seeks summary judgment on Counts I and II, and partial summary judgment on Counts III, IV, V and VII, of the complaint. That same day, Binder filed a Motion to Dismiss and a Motion for Summary Judgment with respect to Counts IV and V of the counterclaim.[1]

## II. *Legal Analysis*

### A. **Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-mov-

---

**1.** The Court considers only the Motion for Summary Judgment because the Motion to Dismiss is duplicative.

ing party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## B. Claims and Counterclaims Relating to Arbitration

Counts I and II of the complaint seek to compel arbitration. Count I of the counterclaim seeks a declaratory judgment that the SEA is not in force. Because this Court has already ruled that the SEA is in force and has submitted the matter to arbitration, those claims are moot. Plaintiffs' Motion for Summary Judgment with respect to Counts I and II of the complaint and Count I of the counterclaim will, therefore, be denied, as moot.

## C. Count III of the Complaint

■ Plaintiffs seek partial summary judgment on Count III, which states a claim for declaratory judgment that Krummenacker is required to sell his Qestec stock pursuant to the CPA. Plaintiffs motion is for partial summary judgment because, as they concede, there is an issue of fact with respect to the price for which the stock would be sold.

Under Article V of the CPA, if a shareholder's employment is terminated for "cause", he must sell his stock to the other shareholders. "Cause" is defined to include, among other things, "willful misconduct or gross negligence of the Shareholder in connection with the performance of his duties". The plaintiffs contend that

the findings of the AAA are sufficient for a finding that there was "cause" for the termination as a matter of law.

In Massachusetts, the decision of an arbitrator will have preclusive effect in subsequent litigation if, as here, the process was the product of "full litigation" and ample opportunity for both sides to present evidence. *See LaRosa v. United Parcel Service, Inc.,* 23 F.Supp.2d 136, 148 (D.Mass.1998). Neither party disputes the preclusive effect of the AAA decision in the instant case.

The AAA found that Krummenacker had interfered with Perkins's personal life, surreptitiously accessed her office computer, threatened violence against "a Qestec employee" and attempted to delay Gorsett's relocation to Massachusetts. The AAA found that his behavior had created an "unprofessional work environment for Gorsett and Perkins" and had subjected Qestec to potential liability. The AAA concluded that Krummenacker's conduct was "unethical, immoral or unprofessional", thereby justifying his termination under § 9B of the SEA.

Little discussion is necessary in order to establish that the above behavior amounts to "willful misconduct" or, at the very least, "gross negligence". Notwithstanding Krummenacker's argument to the contrary, threats of violence against fellow employees, coupled with repeated invasions of their privacy, could well have subjected Qestec to litigation. Indeed, Krummenacker does not dispute that his alleged actions (if they occurred) would amount to willful misconduct. Rather, he questions the findings of the AAA. Those findings, however, are no longer open for revision. The AAA decision found that the alleged misconduct occurred. Accordingly, Krummenacker was terminated for cause and, pursuant to the CPA, he is required to sell his stock. Plaintiffs' motion for partial

summary judgment will be allowed with respect to Count III.

### D. Count IV of the Complaint

■ Plaintiffs seek partial summary judgment on Count IV of the complaint, which states a claim for breach of the SEA. Plaintiffs argue that Krummenacker has breached that Agreement by his conduct with respect to Perkins and Gorsett and by competing with Qestec through Mia.

In Paragraph Nine of the SEA, the parties agreed that "unethical, immoral or unprofessional conduct" on the part of Krummenacker would constitute a "material breach" of the Agreement. Tracking that language, the AAA found that Krummenacker had displayed such conduct with respect to Perkins and Gorsett. Thus, the AAA opinion establishes liability for a breach of Paragraph Nine of the SEA and Qestec is entitled to partial summary judgment on that claim.[2]

■ Plaintiffs also argue that Krummenacker breached Paragraph Seven of the SEA by competing with Qestec. In Paragraph Seven, Krummenacker agreed that he would not "engage directly or indirectly, in the sale, marketing, distribution or promotion of any goods that are competitive with the Products anywhere in the area included in this agreement". It is undisputed that Krummenacker conducted business through Mia which, at times, involved the sale of computer parts (the same kind of business as Qestec).

Krummenacker's response is unclear. He admits that he sold computer parts through Mia but contends that he did so only to customers of Bitter, not of Qestec, and only "for a brief moment until it was deemed that all the players were going to stay and Qestec would live on". He explains that, at the time of the "deals", Qestec's future was in jeopardy and "the opportunities of Qestec [were] not on the mind of shareholders". Finally, he contends that "MIA was not a secret, it was a customer of Qestec". Krummenacker apparently contends that his competition with Qestec was minimal and, in any event, was justified under the circumstances.

Although unstated, Krummenacker is asserting a defense of waiver. If, for example, he can show that directors of Qestec were aware of Mia's business and acquiesced, a reasonable trier of fact could conclude that the non-compete clause of the SEA had been waived. *See Boyden v. Hill,* 198 Mass. 477, 85 N.E. 413, 415 (1908) (setting forth the defense of waiver). Krummenacker alleges that Bitter and Qestec were aware of Mia and there is a genuine issue of material fact concerning the extent of that knowledge and Qestec's response, if any, to it. Given the potential that Krummenacker may have a valid defense, plaintiff's motion for summary judgment will be denied with respect to the allegation of breach of the SEA based upon Paragraph Seven.

### E. Count V of the Complaint

Count V of the complaint states a claim for breach of the covenant of good faith and fair dealing which was implied in the SEA. Plaintiffs allege that Krummenacker's "diversion of possible corporate opportunities of Qestec to Mia ... deprived Qestec of the fruits of the SEA". On that basis, Plaintiffs move for partial summary judgment on the issue of liability.

■ As plaintiffs contend, the implied covenant of good faith and fair dealing is

---

**2.** In their memoranda, plaintiffs do not differentiate between the claims of Qestec (e.g. those relating to the SEA) and the claims of Moulin and Lawrence (e.g. those relating to the CPA), instead referring to "plaintiffs", generally. The Court will make such distinctions where necessary and the plaintiffs are directed to do so in the future.

implied in all contracts to ensure that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract". *Christensen v. Kingston School Committee,* 360 F.Supp.2d 212, 225 (D.Mass.2005) (citation omitted). That phrase must not be read too literally, however, because every breach of contract has the effect of depriving one party of the "fruits of the contract". *Id.* A breach of the implied covenant of good faith and fair dealing will only be found if there is:

> conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.

*Id.* Such bad faith is often evidenced by "deceit or unfair subterfuge" on the part of the breaching party. *Id.*

■ Plaintiffs do not address whether Krummenacker acted in bad faith and Krummenacker offers evidence that he did not. His dealings through Mia were limited to times when the viability of Qestec was in considerable doubt. Moreover, it appears that several employees of Qestec were aware of Mia, suggesting that he did not act through "deceit" or "subterfuge". Accordingly, there is a genuine issue of material fact as to whether Krummenacker acted in bad faith and plaintiffs' motion will be denied with respect to Count V.

### F. Count VII of the Complaint

■ Count VII of the complaint states a claim for breach of fiduciary duty and Plaintiffs seek partial summary judgment on the issue of liability. A claim for breach of fiduciary duty has four elements: 1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages. *Hanover Ins. Co. v. Sutton,* 46 Mass.App.Ct. 153, 705 N.E.2d 279, 288–89 (1999). Plaintiffs contend that the first two elements have been satisfied as a matter of law.

■ Plaintiffs' argument is unpersuasive because it is unclear. Their memorandum refers only to the "plaintiffs", generally, without differentiating among the different fiduciary duties that might be owed to different plaintiffs. If, for example, the motion intends to refer to fiduciary duties owed to Qestec, those duties could potentially arise from Krummenacker's employment, directorship, officership or his role as a shareholder. On the other hand, if the motion intends to refer to fiduciary duties owed to Moulin and Lawrence, the ground for making it (if any) would be Krummenacker's role as a shareholder.

Plaintiffs' memorandum does not specify which particular plaintiff was allegedly owed a fiduciary duty by Krummenacker (Moulin, Lawrence or Qestec), the relationship from which that fiduciary duty arose (Krummenacker's role as employee, officer, shareholder or director) or which specific facts constitute a breach of that fiduciary duty (the findings of the AAA or Krummenacker's alleged competition through Mia). Accordingly, Plaintiffs have not established that there has been a breach of fiduciary duty "as a matter of law". *See Celotex Corp.,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (placing initial burden on moving party to establish entitlement to summary judgment). The motion for partial summary judgment will be denied with respect to Count VII.

### G. Counts II and III of the Counterclaim

■ In Counts II and III of the counterclaim, Krummenacker alleges that Moulin and Lawrence, respectively, breached their duties of "utmost good faith and loy-

alty", owed to him as a shareholder. Krummenacker bases his claims upon the allegation that his termination as an employee, director and officer was, both substantively and procedurally, improper.

Krummenacker's claim that his termination was substantively improper is unsustainable in light of the AAA finding that it was "lawful and justified" under the circumstances. Those findings establish, as a matter of law, that plaintiffs had legitimate cause for the actions they took.

Krummenacker also claims that his termination as a director was procedurally improper because it was conducted in violation of Qestec's Bylaws and Massachusetts law. To resolve that claim, the Court examines the June 5, 2000 special meetings.

■ Krummenacker first argues that the shareholders meeting was not called in accordance with Qestec's Bylaws because it could be called only upon written request of a majority of shareholders. However, Krummenacker misreads the relevant Bylaw. Article II, § 3 states that a special meeting of the shareholders "may be called by the President and shall be called by the President or Clerk at the request in writing of a majority of the Board of Directors". Under that Bylaw, when a written request is made by the Board, the President or Clerk "shall" call a special meeting but, in the absence of such a request, the President still "may" call one. Here, Moulin, the President, called the special meeting and he was within his rights to do so.

The shareholders meeting was convened at 10:30 a.m. with Binder, Moulin, Lawrence and Krummenacker present. According to Article II, § 4 of the Bylaws, a quorum is present if "[t]he holders of a majority of the stock issued and outstanding and entitled to vote, [are] present in person or represented by proxy". Because the owners of 75% of the shares were present (Moulin, Lawrence and Krummenacker), there was a quorum and it was proper for business to be conducted.

The vote to remove Krummenacker as a director was carried by affirmative votes of Moulin and Lawrence, who held one-half of the outstanding shares and two-thirds of the shares represented at the meeting. Article 2, § 5 of the Bylaws states that:

> the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes ... a different vote is required.

The stockholders "present in person" were Moulin, Lawrence and Krummenacker. Moulin and Lawrence held a majority of the stock represented at the meeting and, therefore, their vote to remove Krummenacker as a director was proper.

Krummenacker contends that the (now superceded) Corporation Act, M.G.L. c. 156B § 51, should be construed to require a majority vote of *outstanding* shares but he is mistaken because that statute provides a default rule. It explicitly defers to contrary Bylaws by including the phrase "[e]xcept as otherwise provided in the ... Bylaws". Thus, Krummenacker was properly removed as a director and his termination was both substantively and procedurally within the statutory bounds. Summary judgment in favor of the plaintiffs will be allowed with respect to Counts II and III of the counterclaim. Binder's motion for summary judgment with respect to Count V will also be allowed because that Count is premised upon the allegation that he aided and abetted the conduct alleged in Counts II and III of the counterclaim.

## H. Count IV of the Counterclaim

Count IV of the counterclaim states a claim against Binder for breach of fiduciary duty based upon his role in advising Moulin and Lawrence with respect to Krummenacker's termination. As discussed above, Krummenacker's termination was lawful and there has, therefore, been no breach of fiduciary duty by Qestec's counsel. Binder's motion for summary judgment will be allowed and his Motion to Dismiss will, accordingly, be denied as moot.

## ORDER

In accordance with the foregoing memorandum:

1) plaintiffs' Motion for Partial Summary Judgment (on their complaint) (Docket No. 74) is:

   a) with respect to Counts I and II, **DENIED**, as moot;

   b) with respect to Count III, **ALLOWED**;

   c) with respect to the claim of Qestec in Count IV for breach of Paragraph Nine of the SEA, **ALLOWED**, and otherwise, with respect to Count IV, **DENIED**; and

   d) with respect to Counts V and VII, **DENIED**;

2) plaintiffs' Motion for Summary Judgment (on defendant's counterclaims) (Docket No. 81) is **ALLOWED**;

3) Binder's Motion for Summary Judgment (on defendant's claims) (Docket No. 78) is **ALLOWED**; and

4) Binder's Motion to Dismiss (Docket No. 76) is **DENIED**, as moot.

**So ordered.**