Chantal P. JENNINGS, Plaintiff,

v.

Norman R. NATHANSON, Marc R. Nathanson, Defendants.

No. CIV.A.03–11321–WGY.

United States District Court, D. Massachusetts.

Dec. 13, 2005.

Stephen G. Howard, Kirkpatrick & Lockhart, LLP, Boston, for Chantal P. Jennings, Plaintiff.

Kathleen Ann Lind, Kirkpatrick & Lockhart Nicholson Graham LLP, Boston, for Chantal P. Jennings, Plaintiff.

Charles A. Murray, III, Charles A. Murray, P.C., New Bedford, for Marc R. Nathanson, Norman R. Nathanson, Defendants.

James J. Nixon, James J. Nixon Attorney at Law, North Falmouth, for Marc R. Nathanson, Norman R. Nathanson, Defendants.

Kimberly K. Ryan, Kirkpatrick & Lockhart, LLP, Boston, for Chantal P. Jennings, Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Circuit Judge.

## I. INTRODUCTION

The most poignant passages in Nicholas Sparks' bestseller *The Notebook* limn the twilight of a deep love blighted by a wife's Alzheimer's disease. *See* Nicholas Sparks, *The Notebook* (Warner Books 1996). At the heart of this case is the suffering of Denise Nathanson ("Mrs. Nathanson") from Alzheimer's disease—which resulted in a dispute as to her care between her husband and step-son on one side and her daughter on the other. Sadly, as this litigation worked its way through both state and federal courts, Mrs. Nathanson died. Nevertheless, the federal action ground on. Here, Mrs. Nathanson's daughter, Chantal Jennings ("Jennings") seeks money damages from her step-father and step-brother resulting from their alleged breach of an agreement in which they were to seek Jennings' appointment as guardian of Mrs. Nathanson. While requiring some careful analysis, this case illustrates nothing so much as the excruciating judicial obligations imposed daily upon the devoted and professional judges of the Massachusetts Probate and Family Court.

### A. Factual Background

On October 25, 2001, Mrs. Nathanson, a Massachusetts resident, became the subject of a guardianship petition initiated by the defendants, Dr. Norman Nathanson (Mrs. Nathanson's husband) and Marc Nathanson (Dr. Nathanson's son from a previous marriage). Compl. [Doc. No. 1] ¶ 5. At the time, Mrs. Nathanson was suffering from Alzheimer's disease. *Id.* ¶ 11. Jennings, Mrs. Nathanson's daughter from a previous marriage, did not dispute that her mother required the appointment of a guardian. *Id.* Jennings, however, opposed Dr. Nathanson's request that he serve as her mother's guardian. *Id.* ¶ 13. Because

the appointment was contested, the Barnstable Probate Court ("court" or "probate court") scheduled a trial on the matter for September 16–18, 2002. *Id.* ¶ 15.

According to the probate court, "[t]he sole issue for trial [wa]s to determine who would be the most suitable and appropriate person to be appointed guardian of Denise Nathanson, whether it be Norman R. Nathanson, Chantal Jennings, or another suitable person." *Id.* One of the pretrial orders issued by the probate court stated that

> [i]f this matter settles before trial[,] counsel/parties shall promptly notify the Court[,] and the trial date shall be utilized for *hearing* on an uncontested basis *for approval* of the parties' written agreement and entry of judgment . . . .

*Id.* (emphasis added). On September 3, 2002, in preparation for trial, Jennings scheduled depositions of Dr. Nathanson, Marc Nathanson, and Carol A. Kenney, Esq., who had been appointed guardian ad litem by the court ("G.A.L. Kenney"). *Id.* ¶ 16.

The depositions took place at the offices of Kirkpatrick & Lockhart LLP in Boston. *Id.* ¶¶ 16–17. Present for the depositions were Jennings, represented by Stephen Howard, Esq. ("Attorney Howard"); Dr. Nathanson, represented by both James Nixon, Esq. ("Attorney Nixon") and Elizabeth Balaschak, Esq. ("Attorney Balaschak"); Marc Nathanson, also represented by Attorneys Nixon and Balaschak; Nancy Baley, Esq. ("Attorney Baley") who was Mrs. Nathanson's court-appointed attorney; and G.A.L. Kenney, represented by Cynthia Bourget, Esq. ("Attorney Bourget"). *Id.* ¶ 17(a)-(e). Dr. Nathanson, Marc Nathanson, Attorney Nixon, and Attorney Baley all traveled to the depositions in the same vehicle. *Id.* ¶ 18.

Dr. Nathanson's deposition began at approximately 11:30 a.m. *Id.* ¶ 19. During his deposition, Dr. Nathanson testified that he would agree to Jennings's home care of Mrs. Nathanson if it was "adequate" for her. *Id.* ¶ 20. Further, Dr. Nathanson testified as to his belief that Jennings "would do only what was best for her mother." *Id.* At 2:15 p.m. the deposition was suspended for a lunch break. *Id.* ¶ 21. At that time, Dr. Nathanson expressed his desire to meet privately with Jennings to discuss settlement. *Id.* According to Jennings, the parties agreed that a settlement meeting would take place after the lunch break. *Id.*

At about 3:00 p.m., a conference room was provided for private settlement negotiations between Dr. Nathanson and Jennings. *Id.* ¶ 22. This meeting "was undertaken with the knowledge and consent of all legal counsel" as well as G.A.L. Kenney. *Id.* At about 3:30 p.m., Attorneys Howard and Balaschak entered the conference room to inquire as to the status of the settlement negotiations. *Id.* ¶ 24. Jennings and Dr. Nathanson informed their attorneys that progress had been made and that settlement was a "real possibility." *Id.* According to Jennings, Dr. Nathanson stated that he wanted Jennings to be Mrs. Nathanson's legal guardian. *Id.* Dr. Nathanson stated further, Jennings claims, that "he had financial needs which he needed to have met." *Id.*

According to Jennings, Dr. Nathanson then "demanded" $200,000 in cash from Mrs. Nathanson's individual assets. *Id.* Dr. Nathanson also requested, Jennings claims, that the home shared by himself and Mrs. Nathanson as tenants by the entirety be converted to a tenancy in common and that he be permitted to live in the home. *Id.* Jennings maintains that Dr. Nathanson stated that "if these financial terms were agreed upon, he would agree to the appointment of . . . Jennings as legal guardian" as well as to the home care

of his wife in Jennings' Maine or Virginia residence. *Id.* ¶¶ 20, 24. Settlement negotiations then continued until 4:15 p.m. with the participation of Attorneys Howard and Balaschak. *Id.* ¶ 26.

At 4:15 p.m., Marc Nathanson and Attorney Baley entered the conference room and the terms of the proposed settlement "were discussed on a line-by-line basis." *Id.* Dr. Nathanson, Marc Nathanson, and Jennings subsequently agreed on terms that were acceptable to them. *Id.* Attorney Baley then explained that she wanted time to discuss the terms of the agreement with Dr. Nathanson, Marc Nathanson, and their attorneys, as well as her client, Mrs. Nathanson, who was not present. *Id.* At about 4:30 p.m., Dr. Nathanson, Marc Nathanson, Attorneys Nixon and Balaschak, G.A.L. Kenney and her attorney, and Attorney Baley met in a separate conference room to discuss the proposed settlement. *Id.* ¶ 27. Dr. Nathanson "twice confirmed" to G.A.L. Kenney that the settlement terms "represented the settlement that he wanted." *Id.* Following Dr. Nathanson's confirmation, G.A.L. Kenney and her attorney left the offices of Kirkpatrick & Lockhart. *Id.*

A draft copy of the "Agreement for Judgment" was then presented to Dr. Nathanson and Marc Nathanson, as well as to their attorneys and Attorney Baley. *Id.* ¶ 28. From 6:00 p.m. to 8:30 p.m., the draft agreement was discussed by this group, and minor edits were made. *Id.* At 8:45 p.m., Dr. Nathanson, Marc Nathanson, and their attorneys "confirmed their final agreement with the terms set forth in the Agreement for Judgment." *Id.* ¶ 29. Although Attorney Baley indicated her personal agreement with the terms, she noted that "she needed to personally meet with Denise Nathanson" to discuss the agreement before she could sign it. *Id.* In a separate conference room, Jen-

nings confirmed her agreement with the terms of the settlement. *Id.*

By September 6, 2002, original copies of the agreement were signed in the following order:

(1) Dr. Nathanson on September 3, 2002;

(2) Attorney Balaschak as counsel for Dr. Nathanson, on September 3, 2002;

(3) Jennings on September 3, 2002;

(4) Attorney Howard as counsel for Jennings, on September 3, 2002;

(5) Jennings' brother, Walter H. Meinzer II, on September 4, 2002;

(6) Attorney Baley as counsel for Mrs. Nathanson, on September 4, 2002; and

(7) Marc Nathanson on or about September 5, 2002.

*Id.* ¶¶ 31–36.

The agreement set forth the terms of the settlement including the appointment of Jennings as guardian, authorization for Jennings to move Mrs. Nathanson from Massachusetts to a location in or near Jennings' home in Maine or Virginia, and a plan for Mrs. Nathanson's estate. *Id.* ¶ 30; *id.* Ex. 3 ("Agreement for Judgment"). Under the agreement's estate planning provisions, Dr. Nathanson was to receive $200,000 in cash from Mrs. Nathanson's estate. Agreement for Judgment ¶ 5(b). Additionally, the agreement provided that the home shared by Dr. and Mrs. Nathanson as tenants by the entirety was to be converted to a tenancy in common. *Id.* ¶ 5(a).

The first paragraph of the agreement stated as follows:

It is hereby stipulated and agreed that the following interested persons in the above captioned guardianship *shall request* that the Barnstable Probate Court enter final judgment on the above captioned guardianship case per the terms set forth below . . . .

*Id.* at 1 (emphasis added). The agreement stated further that

> [a]ll parties confirm that they have been represented by legal counsel with regard to this Agreement for Judgment and confirm that, to the extent permitted by Massachusetts law, *as between the parties* the Agreement for Judgment has standing as an enforceable contract. *Notwithstanding same,* all parties agree that this Agreement for Judgment shall be submitted to the Barnstable Probate Court *for review and approval in accordance with the standards of Massachusetts law.*

*Id.* ¶ 8 (emphasis added).

On September 9, 2002, Attorney Nixon on Dr. Nathanson's behalf, sent a letter to the probate court judge presiding over the guardianship trial. Compl. Ex. 4, Letter from Attorney Nixon to Hon. Robert A. Scandurra (Sept. 9, 2002) ("Nixon Letter"). The purpose of the letter was "to inform the court" that Dr. Nathanson "recant[ed] and disavow[ed] his agreement in the appointment of Chantal P. Jennings, as reflected in a certain document captioned 'Agreement for Judgment'." Nixon Letter at 1. The letter noted that during Dr. Nathanson's deposition, he had stated that he did not want Jennings to be his wife's guardian. *Id.* The letter continued:

> After taking the deposition and suspending, a private conference was requested by the deposing counsel between Chantal P. Jennings and Norman Nathanson. Eventually trial counsel was invited to join the private conference. My presence was never requested or sought. An "Agreement for Judgment" was prepared and modified several times by deposing counsel and trial counsel.
> As a result of six or more hours of exhausting conferencing and an offer to pay Norman Nathanson $200,000 on a "take it or leave it" basis, he signed. He

has never received any consideration for his agreement.

> Norman Nathanson now says he recants the agreement and disavows his signature as not having been freely given.

*Id.* at 1–2.

The guardianship trial commenced as scheduled on September 16, 2002 before Judge Robert Scandurra. Defs.' Mem. in Opp'n to Pl.'s Cross–Mot. for Summ. J. [Doc. No. 16] ("Defs.' Opp'n"), Ex. 1, R.App. ("R.App.") at 0130. On the eve of trial, Attorney Balaschak, who had signed the Agreement for Judgement as counsel for Dr. Nathanson, moved to withdraw as co-counsel in the case. R.App. at 0131. Attorney Balaschak informed the probate court that there had been a "complete breakdown in communications" and that she "in fact, had no communication" since the agreement had been entered into and did not believe that she "could adequately represent [her] clients going forward." *Id.* The motion was allowed. *Id.* at 0005.

As a preliminary matter, counsel for Jennings moved for the court to enter judgment in accordance with the terms of the parties' Agreement for Judgment. *Id.* at 0132. Dr. Nathanson's counsel opposed this request and argued that there "[wa]s no agreement now between the parties." *Id.* at 0133. The court observed that as an initial matter it was required "to make an inquiry about the agreement to see if the parties have, indeed, signed it voluntarily and whether they were under duress or coercion." *Id.* To that end, the court inquired of Jennings, Attorney Baley, Marc Nathanson, and Dr. Nathanson as to whether each signed the agreement voluntarily. *Id.* at 0134–35. Each answered affirmatively. *Id.*

After Attorney Baley admitted that she signed the agreement of her own volition as court-appointed counsel for Mrs. Na-

thanson, she sought "to explain the circumstances under which [she] signed it." *Id.* at 0134. Attorney Baley explained that she signed the agreement only after discussing it with Mrs. Nathanson, who, at the time, reluctantly accepted the arrangement. *Id.* Attorney Baley noted, however, that Mrs. Nathanson had since become "very angry and very adamant about not having [Jennings] as her guardian. So I decided, you know, I needed to bring her in here today to have [the court] speak with her if [it] choose to do that." *Id.* The court then inquired of Attorney Baley as to whether, in her opinion, the agreement was in the best interest of Mrs. Nathanson. *Id.* Baley responded that it was not. *Id.*

Following his statement to the court that he voluntarily signed the agreement, Marc Nathanson too was asked by the court whether he believed the agreement was in the best interest of Mrs. Nathanson. *Id.* at 0135. He answered negatively. *Id.* When asked by the court whether he read the agreement over before signing it, Dr. Nathanson stated that he did. *Id.* Dr. Nathanson also stated that he discussed the agreement with Attorney Balaschak before signing. *Id.* When the court inquired as to whether Dr. Nathanson presently believed the agreement was in his wife's best interest, he responded, "[d]efinitely not." *Id.*

Following this colloquy, the court observed that "I am in a position to indicate that this [agreement] has an evidentiary value in the case, but I'm not going to accept it as an agreement. . . . I will accept it as evidence. I guess we'll proceed with the trial." *Id.* The court noted that apart from the enforceability of the agreement as between the parties, it was required to determine whether the agreement was "fair." *Id.* According to the court, the guardianship of Mrs. Nathanson "has been

a contested matter, and I think it deserves a day in court." *Id.* During his opening argument, counsel for Dr. Nathanson explained that:

> Norman Nathanson will no longer pursue his petition for guardian, in deference to the Court appointing a guardian of the property as an independent person or an independent guardian. Norman would like only to be guardian of the person of his wife, and allow an independent person to be guardian of the property.

*Id.* at 0138.

During the course of the two-day trial, the court heard testimony from Dr. Nathanson, Charles Welch, M.D., Marc Nathanson, G.A.L. Kenney, and Jennings. *Id.* at 0130, 0205. Prior to trial, G.A.L. Kenney had been required to submit a written report responding to the following questions:

> 1. Is the proposed guardian husband of the ward, Norman R. Nathanson[,] a suitable person to be appointed as guardian of the proposed ward?
> 2. Would it be in the better interest of the ward that either Walter Meinzer, Chantal Jennings, or another suitable person be appointed?

*Id.* at 0023. By order of the court, G.A.L. Kenney's report was to be an evidentiary exhibit at trial. *Id.* at 0115. G.A.L. Kenney had submitted her report on May 13, 2002. *Id.* at 0003. G.A.L. Kenney's report was based on her review of the guardianship case file as well as interviews with eighteen individuals, including: (1) the current and former attorneys of Dr. Nathanson, Marc Nathanson, Mrs. Nathanson, and Jennings; (2) Mrs. Nathanson's proposed primary care physician; (3) Mrs. Nathanson; (4) Jennings and her husband, Michael; (5) The pastor of Mrs. Nathanson's church; (6) members of Dr. Nathanson's family; (7) Gerald Elowitz, D.Ed., a

clinical neuro-psychologist; and (8) Nancy Erksine, Ph.D., a neuro-behavioral psychology consultant. *Id.* at 0024–25.

According to G.A.L. Kenney's report, Mrs. Nathanson was "emphatic and volunteered to me that she did not want her daughter to be her guardian." *Id.* at 0028. Further, at the time the report was drafted, Jennings herself had indicated that "it would be impractical for her to be guardian since she lives so far away and would not want to remove [Mrs. Nathanson] from [Dr. Nathanson]." *Id.* at 0035. The report recognized that Jennings "is genuinely concerned about her mother's welfare." *Id.* The report expressed concern, however, that Jennings had breached her fiduciary duties as trustee of certain of Mrs. Nathanson's assets and recommended that Jennings be removed from that position. *Id.* at 0042.

The report also noted that Dr. Gerald Elowitz, a clinical neuro-psychologist, had opined that Jennings had "flawed judgment" and would be an unsuitable guardian. *Id.* at 0040. G.A.L. Kenney's report ultimately recommended that Dr. Nathanson be appointed guardian of Mrs. Nathanson. *Id.* at 0042. The report concluded that "[i]t would not be in the better interest of the Ward that … Chantal Jennings or other suitable person be appointed." *Id.* at 0045. When G.A.L. Kenney was first informed that Jennings proposed that she be appointed co-guardian with Dr. Nathanson and to move her mother to Virginia, G.A.L. Kenney drafted an addendum to her report which was filed on June 19, 2002. *Id.* at 0114, 0214. According to the addendum, Jennings' proposal "does not change my original recommendation to the Court that [Dr. Nathanson] be appointed guardian." *Id.* at 0114. Further, the addendum noted, the reports G.A.L. Kenney received indicated that Mrs. Nathanson had "adjusted very well" at the Massachu-

setts facility where she was being cared for, "except for her separation from" Dr. Nathanson. *Id.; see also* Defs.' Opp'n at 4.

During her testimony at trial, G.A.L. Kenney was asked what her current recommendation was for the guardianship of Mrs. Nathanson. R.App. at 0214. G.A.L. Kenney testified that following the events of September 3, 2002 (the date on which Dr. Nathanson signed the Agreement for Judgment), she now recommended the appointment of an independent guardian, as that was in Mrs. Nathanson's best interest. *Id.* G.A.L. Kenney testified that she "had nothing to do with that settlement agreement, nor was [she] invited into the room with Dr. Nathanson and [Jennings]" during the settlement discussions. *Id.* G.A.L. Kenney noted that she "was totally isolated from that agreement." *Id.*

According to G.A.L. Kenney, when she was informed by Dr. Nathanson that he had agreed to let Jennings be guardian she was "dumbfounded." *Id.* at 0215. When asked by the court whether she changed her recommendation because Dr. Nathanson recanted the Agreement for Judgment, G.A.L. Kenney replied,

> I think that the fact that he agreed to it in the first place, which was such a surprise, since all of the time I have spent on this case, and then for him to turn around and recant it is what made me decide that I think it's in Denise's best interest to have an independent guardian.

*Id.* at 0217. In other words, by "just changing his mind so many times" Dr. Nathanson caused G.A.L. Kenney to change her recommendation. *Id.*

When asked whether she believed Jennings was an appropriate person to serve as guardian, G.A.L. Kenney replied that she did not. *Id.* In explaining her opinion, G.A.L. Kenney testified as follows:

I certainly do not question Chantal's genuine concern for her mother. That is not the issue. But I cannot see removing Denise from her husband. They've been married for 26 years. He's extremely devoted to her. I heard no one say anything other than glowing reports of his devotion to Denise, and her—hers to him. And so that—that is my number one reason.

The second reason is that the handling of [Mrs. Nathanson's] funds, I thought, by Chantal was most inappropriate, the fact that there was no inventory, no accounting, and the fact that the funds were invested in the single entity.

*Id.*

In its decision issued on October 25, 2002, the probate court appointed Mary Gaffney, Esq. ("Attorney Gaffney") as "permanent guardian of the person and the estate" of Mrs. Nathanson. Exs. Accompanying Defs.' Mem. in Opp'n to Pl.'s Mot. to Re–Open Case ("Defs.' Opp'n Exs.") [Doc. No. 22], Ex. 1. Additionally, the court appointed Robert J. Connell as monitor. *Id.* On the same day, the court issued its "Findings & Rationale." R.App. at 0259–64. In its findings, the court observed that Jennings "rarely visited her mother over the years", and, when she did visit, "she provided minimal assistance to her mother." *Id.* at 0260.

Additionally, the court noted, although G.A.L. Kenney's report originally recommended Dr. Nathanson as guardian, "at the time of trial [she] changed her recommendation and recommended that an independent guardian be appointed ...." *Id.* at 0261. As the court observed, G.A.L. Kenney's

reason for changing her original recommendation was that she was concerned with Dr. Nathanson's stability, particularly in light of the fact that Dr. Nathanson entered into an agreement with ...

Jennings to settle this matter, which was very much *against* what the GAL thought was in Denise's best interest, and then had recanted this agreement. *Id.* The court observed that although Dr. Nathanson was a "caring and devoted husband", because of his age of 85 years, the fact that caring for his wife was "very stressful to him", and the fact "that he has exhibited instability vis-a-vis the 'Agreement for Judgment,' he is not the most suitable person" to serve as guardian. *Id.* at 0261–61.5.

According to the court, Jennings too was an inappropriate person to serve as guardian. *Id.* at 0261.5. In reaching this conclusion the court relied on G.A.L. Kenney's report and testimony that Jennings' plan to remove her mother outside of Massachusetts for care at Jennings' home "would *not* be in the best interest of [Mrs. Nathanson]." *Id.* Rather, the court observed, G.A.L. Kenney concluded that "it would be very detrimental to [Mrs. Nathanson,] as this move would mean that Dr. Nathanson's visits" would become less frequent. *Id.* Moreover, the court noted, "Ms. Jennings has never cared for nor had any training to care for acutely ill or chronically ill individuals, and Ms. Jennings rarely visited her mother when she was living at home." *Id.*

The court also observed that "Ms. Jennings is not a licensed nurse, nor has she taken any first aide classes or classes or courses pertaining to working with clients who have Alzheimer[']s disease." *Id.* Moreover, the court concluded, Jennings "has no qualifications to manage and supervise nursing personnel, nor has she ever taken care of anyone who was acutely or chronically ill." *Id.* Further, the court pointed out, Jennings "has never offered to assist or care for her mother once she became aware that she was ill and could no longer care for herself, even after she be-

came aware that Dr. Nathanson was extremely fatigued caring for his wife." *Id.* Accordingly, the court ruled that "it is in the best interest" of Mrs. Nathanson that an independent person be named guardian. *Id.* at 0262.

The court did not fail to address the parties' written Agreement for Judgment. *Id.* at 0262, 0264. As the court observed, "[i]n order to appoint a person as a guardian of another, the Court must find that the appointee is suitable to serve as a guardian." *Id.* at 0263 (citing *Curran v. Carroll,* 318 Mass. 780, 63 N.E.2d 334 (1945); *Guardianship of Bassett,* 7 Mass. App.Ct. 56, 63, 385 N.E.2d 1024 (1979)). Thus, the court held, it "must base its determination of whether Chantal Jennings is a suitable person for guardianship of her mother upon a careful consideration of attendant facts and circumstances." *Id.* at 0263–64. According to the court, the parties' Agreement for Judgement simply "is not dispositive as to the issue of suitability of either party as guardian . . . ." *Id.* at 0264.

Accordingly, the court ruled, "[e]ven if the parties were in total agreement regarding the appointment of Chantal Jennings as guardian, the Court must make its own finding that she is suitable to serve as guardian." *Id.* (citation omitted). Because "the validity of the agreement is not dispositive on Chantal Jennings' [ ]00 suitability as guardian," the probate court "decline[d] to address" that issue. *Id.* The court then ruled that "appointing Chantal Jennings as guardian of Denise Nathanson would not be in the best interests of the ward." *Id.* (citing *King v. Dolan,* 255 Mass. 236, 237, 151 N.E. 109 (1926); *New Eng. Merchs. Nat'l Bank v. Spillane,* 14 Mass.App.Ct. 685, 693, 442 N.E.2d 421 (1982)). The interests of Mrs. Nathanson were best served, concluded the court, by the appointment of an independent guardian. *Id.*

Upon Jennings's subsequent appeal of the probate court's appointment of Attorney Gaffney as guardian, she argued that Massachusetts law "requires the appointment of a legal guardian to be premised upon evidence of suitability of the guardian." Compl. ¶¶ 52–53. As no evidence whatsoever was submitted regarding Attorney Gaffney, Jennings claimed that her appointment was in error. *Id.* ¶ 51–53. On November 29, 2002, a single justice of the Massachusetts Appeals Court remanded the case to the probate court to take evidence regarding Attorney Gaffney's suitability. R.App. at 0265–66. On March 18, 2003, the probate court reaffirmed its appointment of Attorney Gaffney as guardian. *Id.* at 0267–70.

On April 15, 2003, Jennings appealed the probate court's March 18, 2003 decision as well as its October 25, 2002 judgment. Compl. ¶ 55. On appeal, Jennings sought specific enforcement of the parties' Agreement for Judgment. Pl.'s Mot. to Re-Open Case ("Pl.'s Mot. Reopen") [Doc. No. 20] at 3. According to Jennings, while the appeal was pending in June 2003, Dr. Nathanson and Marc Nathanson, through counsel, proposed settlement on substantially the same terms as those specified in the September 3, 2002 Agreement for Judgment. Compl. ¶ 58. The new proposal, however, included increased financial demands, including a payment of $500,000 (rather than $200,000) to Dr. Nathanson. *Id.* Additionally, Jennings claims, Dr. Nathanson now insisted on receiving full title to the home he shared with Mrs. Nathanson (rather than a tenancy in common). *Id.*

Relying on federal diversity jurisdiction, Jennings filed a new complaint [Doc. No. 1] in this Court on July 15, 2003 against Dr. Nathanson and Marc Nathanson (col-

lectively, "the Nathansons"). Jennings' claims arise from the Nathansons' alleged breach of the September 3, 2002 Agreement for Judgment and include: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud and deceit; and (4) intentional infliction of emotional distress. *Id.* at 1, ¶¶ 69–80. On August 5, 2003, the Nathansons filed a motion to dismiss, for summary judgment, and to stay the proceedings [Doc. No. 4]. On October 1, 2003, Jennings filed a Cross Motion for Summary Judgment [Doc. No. 10]. On the same date, Jennings moved for the Court to impose sanctions against the defendants pursuant to Federal Rule of Civil Procedure 11(b)(1)(2) [Doc. No. 13].

On October 9, 2003, this Court ordered the case administratively closed "without entry of judgment, until the Mandate from the Massachusetts Appeals Court is issued." Order of Oct. 9, 2003 [Doc. No. 17]. The Court's order stated further that "[t]his closure is without prejudice to either party moving to restore it to the docket, if any further action is required." *Id.*

On April 8, 2004, the Massachusetts Appeals Court heard oral argument in Jennings's appeal of the probate court's two judgments. Pl.'s Mot. Reopen at 5. Prior to the decision from the Massachusetts Appeals Court, Mrs. Nathanson died on January 5, 2005. *Id.*

Notwithstanding the death of Mrs. Nathanson, Dr. Nathanson filed a Motion to Limit Issues on Appeal. Defs.' Mem. in Opp'n to Pl.'s Mot. to Re–Open Case ("Defs.' Opp'n Mem.") [Doc. No. 21] at 2. According to Dr. Nathanson, "[t]he remaining issue, which concerns the enforceability of the so-called 'Agreement for Judgment' that was rejected by the Probate Court Judge, remains ripe for decision . . . ." Defs.' Opp'n Exs., Ex. 5 at 1.

Jennings opposed Dr. Nathanson's motion to limit the issues on appeal and requested that the court "dismiss the entire appeal without decision with the finding that the entire appeal is now moot." Defs.' Opp'n Exs., Ex. 6 at 2. Jennings made clear, however, "that she intended to litigate the [breach of] contract issues" in this Court. Defs.' Opp'n Mem. at 8.

On March 30, 2005, the Massachusetts Appeals Court entered an order dismissing the entire appeal as moot. Defs.' Opp'n Exs., Ex. 7. According to the court,

> [Dr. Nathanson] contends that while most of the issues are moot, the enforceability of the Agreement for Judgment is not, but rather remains ripe for decision. The daughter[,] who initially raised the appeal, now claims that the appeal is moot. It appears to us that the parties have made different assessments of their likelihood of prevailing in the Federal District Court diversity action the daughter filed on the same matter. That stratagem does not affect our conclusion that as to the case before us concerning the Agreement for Judgment, the matter is moot.
>
> The guardianship issues are moot because the ward has died. The enforceability of the Agreement for Judgment is also moot because the obligations in the agreement are predicated on Chantal's appointment as guardian, which cannot take place. We therefore dismiss the appeal, not on the merits, but because it has become moot.

*Id.*

On April 5, 2005, Jennings filed a motion to reopen her case [Doc. No. 20] in this Court. The Nathansons opposed the motion [Doc. No. 21]. On April 27, 2005, this Court entered an order allowing Jennings' Motion to Reopen. The order noted, however, that the Nathansons' opposition would be treated as a motion to dismiss on

the grounds of res judicata and judicial estoppel. Thus, before the Court are the following:

(1) The Nathansons' Motion to Dismiss and/or for Summary Judgment [Doc. No. 4];

(2) Jennings' Cross–Motion for Summary Judgment [Doc. No. 10];

(3) Jennings' Motion for Sanctions [Doc. No. 13]; and

(4) The Nathansons' Opposition to Jennings' Motion to Reopen [Doc. No. 21] which this Court treats as a Motion to Dismiss on the grounds of res judicata and judicial estoppel.

## B. Jennings' Claims

### 1. Breach of Contract

As mentioned above, Jennings' Complaint contains four counts. In Count I, Jennings alleges breach of contract. Compl. ¶¶ 69–71. According to Jennings, the September 9, 2002 letter to the probate court in which Dr. Nathanson sought to recant the Agreement for Judgment constituted a breach of that agreement. *Id.* ¶ 41. Additionally, Jennings maintains, the Agreement for Judgment was breached by Dr. Nathanson and Marc Nathanson when they "made representations and introduced evidence" during the guardianship trial "that were intended to cause the Court to enter a judgment appointing a person other than ... Jennings" as guardian. *Id.* ¶¶ 43–44; *see also id.* ¶¶ 67–68.

Jennings claims that the probate court's failure to adopt the Agreement for Judgment was caused by the Nathansons' breach of the Agreement for Judgment. *Id.* ¶ 46. As a result, Jennings maintains, she has suffered "personal and emotional

anxiety" relative to "(i) the care and future welfare of her mother ...; (ii) the [guardianship] trial; and (iii) the conduct of [Dr.] Nathanson and Marc R. Nathanson which she considered dishonest and intentionally damaging to both her and her mother ...." [1] *Id.* ¶ 47. Further, Jennings claims, "the pre trial, trial and post trial process were emotionally upsetting for [her] and financially very costly by way of legal fees, trial costs, lodging and other expenses which were incurred." *Id.* ¶ 48. Prior to her mother's death, Jennings claims that she "continued to incur damages in the form of a significant decline in the quality of her own feelings for her mother's well-being, her own well-being and legal fees and legal costs." *Id.* ¶ 57.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Count II of Jennings' Complaint alleges breach of the implied covenant of good faith and fair dealing. *Id.* ¶ 72–74. Jennings maintains that she "reasonably expected that [the Nathansons] would follow the contract terms and affirmatively request that the ... Probate Court enter judgment on the terms specified therein." Pl.'s Mem. in Supp. of Cross–Mot. for Summ. J. ("Pl.'s Summ. J. Mem.") [Doc. No. 11] at 8. According to Jennings, the Nathansons' conduct "had the effect of destroying [her right] to receive the benefits of the contract ...." *Id.* Such conduct, Jennings argues, constituted a breach of the implied covenant of good faith and fair dealing, causing her personal, emotional, and financial damages. Compl. ¶¶ 72–73.

### 3. Fraud and Deceit

Count III of Jennings Complaint alleges that the Nathansons' "actions and omissions" were "intentional", "fraudulent",

---

1. Specifically, Jennings alleges that she was forced to watch her mother's "condition deteriorate as she [wa]s cared for daily by strangers who d[id] not know her and d[id] not love her." Compl. ¶ 56. According to Jennings, "[t]his process [was] emotionally devastating and ... heightened by [her] inability ... to assist her mother as legal guardian ...." *Id.*

and "deceitful". *Id.* ¶ 75. Such fraud and deceit, Jennings claims, caused her damages. *Id.* ¶ 76.

### 4. Intentional Infliction of Emotional Distress

Finally, Count IV of Jennings' Complaint asserts an intentional infliction of emotional distress claim. Compl. ¶¶ 78–80. According to Jennings, the behavior of Dr. and Marc Nathanson was "extreme and outrageous and beyond the bounds of decent human conduct in a civilized society." *Id.* ¶ 78. Such behavior, she claims, caused her damages. *Id.* ¶ 79.

## II. DISCUSSION

### A. Standard of Review: Summary Judgment

There is here no doubt that the parties understand that the Nathansons' motion of August 5, 2003 will be treated as one for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (internal quota-

tion marks omitted) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Braga v. Genlyte Group Inc.,* 420 F.3d 35, 38 (1st Cir.2005). The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings and[,] by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (citation and internal quotation marks omitted). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [courts] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001).

The Nathansons have moved for summary judgment as to all of Jennings's claims on the grounds of res judicata[2] and because, they claim, Jennings cannot establish a causal connection between her claimed damages and their conduct.[3]

---

**2.** Although under Massachusetts law the term "res judicata" includes both claim and issue preclusion, *Kobrin v. Board of Registration in Med.,* 444 Mass. 837, 843, 832 N.E.2d 628 (2005), the Nathansons make clear that their argument is based solely on issue preclusion. *See* Defs.' Mem. in Supp. of Mot. to Dismiss and/or for Summ. J. and/or for Stay of Proceedings ("Defs.' Summ. J. Mem.") [Doc. No. 5] at 5; Defs.' Opp'n to Pl.'s Mot. for Sanc-

tions [undocketed] at 2 ("The argument is based solely on 'issue preclusion ....' ").

**3.** The Nathansons also raised these arguments in their Opposition to Jennings' Motion to Reopen the case, which this Court indicated would be treated as a Motion to Dismiss. Defs.' Opp'n Mem. at 4–6. The Nathansons' Opposition Memorandum also raised the defense of judicial estoppel. *Id.* at 8–9. Be-

Defs.' Summ. J. Mem. at 3–7. Jennings has also moved for summary judgment arguing that she is entitled to judgment as matter of law on all counts asserted in her Complaint. Pl.'s Summ. J. Mem. at 1–2.

## B. Collateral Estoppel Effect of State Court Proceedings

■ The Nathansons contend that they are entitled to summary judgment under the doctrine of collateral estoppel, also known as issue preclusion. Defs.' Summ. J. Mem. at 3–7; *see Gonzalez–Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir.2005) ("[C]ollateral estoppel [is] also known as issue preclusion . . . ."). This Court looks to state law to "ascertain[] whether issue preclusion flows as a consequence of previous state court litigation . . . ." *Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29, 32 (1st Cir.1991). Under Massachusetts law, the party seeking to invoke issue preclusion "must establish that [ (1) ] the issue of fact sought to be foreclosed actually was litigated and determined in a prior action between the parties or their privies, and [ (2) ] the determination was essential to the decision in the prior action." *Heacock v. Heacock*, 402 Mass. 21, 25, 520 N.E.2d 151 (1988).

■ The Nathansons characterize the issue common to this case and the proceedings before the probate court as whether the Agreement for Judgment "was binding." Defs.' Summ. J. Mem. at 5. According to the Nathansons, this issue was determined by the probate court when it ruled that "[e]ven if the parties were in total agreement regarding the appointment of Chantal Jennings as guardian, the Court must make its own findings that she is suitable to serve as guardian." *Id.* (alteration in original) (internal quotation marks and citation omitted); *see also* R.App. at

0264. According to the Nathansons, Jennings' claims must fail because "the essential issue underlying each . . . is whether the probate court should have entered the 'Agreement for Judgment' or not," which has already been decided. Defs.' Summ. J. Mem. at 3.

The issue central to Jennings' claims, however, is not whether the Agreement for Judgment was binding on the probate court, but whether it was binding on *the Nathansons*. That is, Jennings' claims are based on the Nathansons'—not the probate court's—failure to adhere to the agreement which provided:

> It is hereby stipulated and agreed that the following interested persons in the above captioned guardianship case *shall request that the Barnstable Probate Court enter final judgment* on the above captioned guardianship case *per the terms set forth below*

Agreement for Judgment at 1 (emphasis added). The Nathansons concede that the "the probate court judge did not expressly decide the issue of whether the 'Agreement for Judgment' was binding on *the parties* . . . ." Defs.' Summ. J. Mem. at 4 (emphasis added).

The Nathansons argue, however, that the probate court did make "subsidiary findings on that issue." *Id.* That is, the probate court in its opinion noted that

> almost immediately after signing the agreement, Dr. Nathanson expressed grave concerns about having signed this agreement to his son Marc, and also to Attorneys Nixon and Baley. He said he wished to recant said agreement. He testified that he felt pressured to sign the agreement, and that he was physically exhausted at that time.

cause this Court now disposes of the case based on the cross-motions for summary

judgment, it need not address this latter argument which is now moot.

R.App. at 0262. The Nathansons point out that "[t]he judge also commented on [G.A.L. Kenney's] testimony that she was 'dumfounded' when she heard of the agreement and that she had been isolated during discussions between Dr. Nathanson and Ms. Jennings and their counsel." Defs.' Opp'n Mem. at 6.

According to the Nathansons, based on these "subsidiary findings and discussion[,] there is a strong implication that the judge determined [that] the 'Agreement' was unenforceable." *Id.* at 7. Despite the Nathansons' argument, the cited portions of the probate court's decision by no means constitute "findings." Rather, they summarized portions of trial testimony. That the probate court did not make any findings—subsidiary or otherwise—as to the enforceability of the agreement is evident from even a cursory reading of its decision: "Since the validity of the agreement is not dispositive on Chantal Jennings's suitability as guardian, *the Court declines to address the validity of the agreement.*" R.App. at 0264 (emphasis added). Accordingly, the Nathansons have not established that the enforceability of the agreement between the parties actually was litigated and determined. *Heacock,* 402 Mass. at 25, 520 N.E.2d 151. As such, their collateral estoppel argument fails.

## C. Causal Connection Between the Nathansons' Actions and Jennings' Damages

According to the Nathansons, the probate court's express determination that it was not bound by the parties' settlement agreement dooms Jennings' claims "since it precludes a showing that contract or tort damages were proximately caused by [their] actions." Defs.' Summ. J. Mem. at 6. As mentioned above, Jennings claims the following damages resulting from the Nathansons' actions: (1) "significant personal and emotional anxiety regarding: [(a)] the care and future welfare of her mother ...; [(b)] the trial; and [(c)] the conduct of [the Nathansons,] which she considered dishonest and intentionally damaging to both her and her mother ...", Compl. ¶ 47; (2) emotional suffering resulting from her mother being "cared for daily by strangers" and her inability to be legal guardian of her mother, *id.* ¶¶ 56, 64; (3) a "significant decline in the quality of her own feelings for her mother's well-being [and] her own well-being", *id.* ¶ 57; (4) legal fees and costs, *id.* ¶¶ 57, 66; and (5) "extreme emotional distress" resulting from the Nathansons' proposal to settle the guardianship appeal in exchange for Jennings' adherence to increased financial demands. *Id.* ¶¶ 58–60, 65.

These claimed damages almost uniformly rely on the probate court's failure to enter judgment on the terms of the parties' settlement agreement. To the extent Jennings so relies, she cannot recover damages. It is impossible for her to demonstrate that but for the Nathansons' conduct: (1) the guardianship trial would have been avoided and (2) she would have been appointed guardian. *Anda v. Ralston Purina, Co.,* 959 F.2d 1149, 1153 (1st Cir. 1992) (quoting Restatement (Second) of Contracts § 347 cmt. e (1981) to explain that in breach of contract actions "[t]he injured party is limited to the damages based on his actual loss *caused by the breach*" (emphasis added)); *Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1092 (1st Cir.1989) ("[T]o recover for fraud, a claimant must show that the asserted damage was caused by ... the opposing party's false representations."); *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145, 355 N.E.2d 315 (1976) (explaining that, to recover for intentional infliction of emotional distress, a plaintiff must show "that the actions of the defendant were the cause of the plaintiff's distress").

As the probate court noted in its October 25, 2002 ruling, it was not bound in any way by the parties' Agreement for Judgment.[4] R.App. at 0264. Rather, the court observed, it was required to appoint a guardian based on the proposed individual's suitability and based on Mrs. Nathanson's best interests. *Id.* As discussed in detail above, the probate court concluded that it would not be in Mrs. Nathanson's best interest for Jennings to be guardian. *Id.* at 0261.5. There is simply no way that Jennings can prove that had the Nathansons "affirmatively support[ed] all of the terms of the Agreement", the probate court would have rubber-stamped the agreement and appointed her guardian. Pl.'s Summ. J. Mem. at 9.

Jennings argues that had the Nathansons supported her appointment as guardian as promised, it is "unlikely" that the probate court would have rejected the agreement. *Id.* at 9. The record evidence, however, is to the contrary. When the court first inquired of the parties to determine whether the settlement was entered into voluntarily, Attorney Baley, representing Mrs. Nathanson, informed the court that her client had become "very adamant about not having [Jennings] as her guardian." R.App. at 0134. Attorney Baley then informed the court that the agreement was not in Mrs. Nathanson's best interest.[5] *Id.* Thus, even if Dr. Nathanson did not attempt to recant the agreement and even if he and Marc Nathanson testified in support of Jennings's appointment, given Attorney Baley's sworn statements to the court, Jennings cannot show that the probate court blindly would

have adopted the Agreement for Judgment.

Additionally, G.A.L. Kenney's report, which was docketed with the probate court prior to the parties' adoption of the Agreement for Judgment, concluded that it would not be in Mrs. Nathanson's best interest for Jennings to serve as guardian. R.App. at 0045. The probate court relied heavily on G.A.L. Kenney's report in concluding that Jennings was an unsuitable person to serve as guardian. *Id.* at 0261.5–62. G.A.L. Kenney also testified at trial that Jennings was ill-suited to serve as Mrs. Nathanson's guardian. *Id.* at 0217. The court agreed. *Id.* at 0261.5. In sum, based on the record evidence, it is impossible for Jennings to establish that but for the Nathansons' alleged breach, (1) the matter would not have proceeded to trial, and (2) she would have been appointed guardian. Accordingly, Jennings cannot recover for any damages arising from the guardianship trial or the court's failure to appoint her as guardian. *Anda*, 959 F.2d at 1153.

### D. Breach of Contract

The Nathansons suggest that Jennings's contract damages are predicated entirely on the probate court's failure to appoint her as guardian. Defs.' Summ. J. Mem. at 6. As explained above, such damages are unrecoverable. A fair reading of Jennings's Complaint, however, indicates that her claimed damages are more inclusive. In addition to the alleged damages stemming from the costs of trial and the emotional harm attendant to the probate

---

4. Indeed, Jennings even acknowledges that the court "could have rejected all or part of the Agreement for Judgment ...." Pl.'s Summ. J. Mem. at 9. The Agreement for Judgment itself also recognized that it required approval by the probate court. Agreement for Judgment ¶ 8.

5. Though this was arguably a breach of the Agreement for Judgment by Attorney Baley, she is not a named defendant in this action. Accordingly, any impact Attorney Baley may have had on Jennings' damages is of no consequence here.

court's failure to appoint her as guardian, Jennings also claims emotional damages resulting from the Nathansons' failure to support her request to be guardian. That is, even if the probate court was not bound by the parties' settlement agreement, Jennings appears to claim that the Nathansons' repudiation of the agreement *itself* "emotionally devastated" her. Compl. ¶ 47 (noting that Jennings endured "significant personal and emotional anxiety regarding . . . the conduct of [the Nathansons,] which she considered dishonest").

In other words, Jennings claims that even if the court was not obligated to appoint her, the Nathansons were contractually obligated to seek her appointment, and their failure to do so—on its own—caused her emotional damages. *See id.;* Pl.'s Summ. J. Mem. at 9 (noting that although court was not bound by the parties' settlement, Jennings "was contractually entitled to [the Nathansons'] affirmative support of all of the terms of the Agreement"). Under Massachusetts law, however, "damages for mental suffering are generally not recoverable in an action for breach of contract." *Sackett v. St. Mary's Church. Soc.,* 18 Mass.App.Ct. 186, 187, 464 N.E.2d 956 (1984) (citing *McClean v. University Club,* 327 Mass. 68, 76, 97 N.E.2d 174 (1951)); *see also Orono Karate, Inc. v. Fred Villari Studio of Self Defense, Inc.,* 776 F.Supp. 47, 52 (D.N.H. 1991) ("In Massachusetts, it has long been settled that mental suffering resulting from breach of contract is not a subject of compensation." (internal quotation marks and citation omitted)).

■ Two exceptions to this general rule permit a plaintiff to recover emotional damages. First, recovery for emotional harm may be permitted when the breach of contract "also caused bodily harm." Restatement (Second) of Contracts § 353 (1981). Second, a plaintiff may recover emotional damages if "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." *Id.* As Jennings does not claim to have suffered any physical injury, only the second exception is of concern here.

Although Massachusetts law does not completely bar the recovery of emotional damages in breach of contract actions, "the showing that a plaintiff must make is quite high, and has been satisfied primarily in cases involving some direct causal link to *physical harm.*" *Sorenson v. H & R Block, Inc.,* No. 99–10268–DPW, 2002 WL 31194868, at *14, 2002 U.S. Dist. LEXIS 18689, at *44 (D.Mass. Aug. 27, 2002) (Woodlock, J.) (unpublished opinion) (emphasis added), *aff'd,* 107 Fed.Appx. 227 (1st Cir.2004). As the Massachusetts Appeals Court has noted,

> When physical injury results, the promisor may fairly be held to anticipate related emotional suffering. When no physical injury results and the facts are devoid of harmful intent, emotional distress is best written off as among the shocks and counter shocks of life which the law does not seek to remedy.

*St. Charles v. Kender,* 38 Mass.App.Ct. 155, 161, 646 N.E.2d 411 (1995).

This Court has been able to discover only a single decision by a Massachusetts court permitting the recovery of emotional contract damages where no physical injury resulted. In *Ocean v. Marriott Corp.,* Seraphim Ocean ("Ocean") had been employed by Marriott as an executive chef. 2 Mass. L. Rep. 628, 1994 WL 878962, at *1, 1994 Mass.Super. LEXIS 386, at *2 (1994) (Lopez, J.). Following his termination, Ocean brought a discrimination suit against Marriott. *Id.* Prior to trial, the parties entered into a settlement agreement in which Ocean was to receive $50,000 and reemployment by Marriott. *Id.*

When Occean reported to work pursuant to the agreement, he was informed that no position was available and was sent to another Marriott facility 200 miles away. *Id.* at *1, 1994 Mass.Super. LEXIS 386, at *3. When Occean arrived at that facility, he was again told that no position was available for him. *Id.* Marriott then assigned Occean to several different locations for brief assignments. *Id.* Eventually, he was assigned to a Marriott facility in New Jersey before being terminated yet again. *Id.* at **1–2, 1994 Mass.Super. LEXIS 386, at *3–4. In his subsequent breach of contract action against Marriott, the court concluded that Occean was entitled to emotional damages. *Id.* at **5–6, 1994 Mass.Super. LEXIS 386, at *13–15.

Although the court recognized that such damages ordinarily are not recoverable, it noted that they have been available "where the contract is such that emotional distress is a reasonably foreseeable consequence of its breach." *Id.* at *5, 1994 Mass.Super. LEXIS 386, at *13. According to the court, emotional damages were "particularly appropriate" given "the subject matter and background of this contract." *Id.* As the court noted, "[t]his agreement represented the settlement of a discrimination claim, and was essentially an employment contract with assurances to employ Occean at a specific site, for a specific salary." *Id.* at *5, 1994 Mass.Super. LEXIS 386, at *13–14. Further, "Marriott knew that Occean wanted to be assigned to a facility close to his family. It was certainly foreseeable to Marriott that breach of that agreement would result in emotional distress to Occean." *Id.* at *5, 1994 Mass.Super. LEXIS 386, at *14.

Additionally, the court observed, important public policies justified permitting Occean to recover emotional damages. *Id.* That is, in entering the settlement agreement, Occean "relinquished all rights to pursue his discrimination claims. Had he pursued those claims, he would have been entitled to seek a wide range of damages, including emotional distress .…" *Id.* If Occean was limited to traditional contract damages, the court noted, it "would be encouraging employers faced with discrimination suits to settle, and subsequently breach those settlement agreements, as a means to limit liability." *Id.* This result "would undermine the underlying purposes for heightened damages in discrimination cases." *Id.*

The facts of *Occean* are readily distinguishable from this case. In *Occean,* whether the plaintiff received the employment position promised was within the full control of Marriott. In this case, the parties promised only to *request* that Jennings be appointed guardian. Agreement for Judgment at 1. As discussed above, such a result was not within the control of the parties, but rather the Barnstable Probate Court. R.App. at 0263–64. Thus, *Occean* would be more akin to this case if, rather than promising Occean a specific position, Marriott agreed simply to recommend that Occean receive that position. In other words, unlike the defendant in *Occean,* the Nathansons here lacked the authority to give full effect to the settlement terms. Because Jennings had no guarantee of becoming guardian with or without the Nathansons' performance, this Court concludes that the alleged breach in this case was not of such a nature that emotional distress was particularly likely.[6] *See St.*

6. Moreover, the public policy concerns in *Occean* relating to discrimination actions are not present here. *Sorenson,* 2002 WL 31194868, at *14, 2002 U.S. Dist. LEXIS 18689, at *44 (noting that even if *Occean* represents a viable approach to awarding emotional damages in breach of contract actions, because the same public policy concerns were not present, the court "f[ou]nd no basis for recognizing emotional distress damages").

*Charles,* 38 Mass.App.Ct. at 159, 646 N.E.2d 411, Restatement (Second) of Contracts § 353 cmt. a & illus. 1–3 (noting that it is an "exceptional situation", where emotional damages are recoverable in contract actions not involving physical harm and that such cases usually involve contracts with carriers or innkeepers or contracts for the disposition of dead bodies). Because Jennings has not alleged recoverable damages on her breach of contract claim, summary judgment is warranted for the Nathansons as to Count I.

### E. Implied Covenant of Good Faith and Fair Dealing

"Under Massachusetts law, every contract includes an implied duty of good faith and fair dealing." *Lohnes v. Level 3 Communications, Inc.,* 272 F.3d 49, 61 (1st Cir.2001) (citing *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 583 N.E.2d 806 (1991)). The implied covenant "forbids a party from doing anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Id.* (internal quotation marks and citation omitted). Jennings claims that "by failing to follow the material terms of the Agreement for Judgment and, in fact, by introducing evidence and making representations [to the probate court] which were contrary to the contractual terms of the Agreement for Judgment", the Nathansons breached the implied covenant. Pl.'s Summ. J. Mem. at 8. Jennings' claim essentially boils down to her allegation that the defendants breached the contract. *See id.*

■ As this Court has recently noted, "while every breach of contract has the 'effect of destroying or injuring the rights of the other party to receive [its] fruits,' not every breach of contract is a breach of the implied covenant of good faith and fair dealing." *Christensen v. Kingston Sch.*

*Comm.,* 360 F.Supp.2d 212, 226 (D.Mass. 2005) (alteration in original) (citation omitted); *Qestec, Inc. v. Krummenacker,* 367 F.Supp.2d 89, 97 (D.Mass.2005) (Gorton, J.) (citing *Christensen,* 360 F.Supp.2d at 226). Rather, recovery under the implied covenant "requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage." *Christensen,* 360 F.Supp.2d at 226.

■ Jennings highlights the fact that nine months after the Nathansons' alleged breach, they proposed resolving the guardianship appeal on the same terms as the Agreement for Judgment, but significantly increased their financial demands. Pl.'s Summ. J. Mem. at 9. This allegation, however, is insufficient to show that the alleged breach nine months earlier—the act Jennings claims violated the implied covenant—was an attempt by the Nathansons to gain economic leverage. Nowhere does Jennings claim that the Nathansons sought increased financial incentives *prior to or upon* allegedly breaching the agreement. Not only did Dr. Nathanson not demand more favorable contract terms around the time of the alleged breach, but he continued to pursue his own quest to become his wife's guardian. R.App. at 0138. Such a position cannot be squared with that of an individual who, at the same time, desired increased financial incentives to support the appointment of another.

In short, Jennings has not made out a claim for a breach of the implied covenant of good faith and fair dealing because she has not alleged facts from which it could be found that the Nathansons' alleged breach was an attempt to gain undue economic advantage. *Christensen,* 360 F.Supp.2d at 229 ("[C]laims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of

contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage.").

■ Even if the Nathansons' conduct constituted a breach of the implied covenant, Jennings would not be entitled to recovery. Claims based on a breach of the implied covenant of good faith and fair dealing sound in contract as opposed to tort. *Bertrand v. Quincy Mkt. Cold Storage & Warehouse Co.*, 728 F.2d 568, 571 (1st Cir.1984) ("By definition this is an implied covenant in an employment contract; perforce it is a contract claim and not a tort."); *Aisenberg v. Hallmark Mktg. Corp.*, 337 F.Supp.2d 257, 261 (D.Mass. 2004) (Gorton, J.). As discussed above, at best Jennings can only establish a causal relationship between the Nathansons' alleged breach and her *emotional* damages. Such damages, this Court has determined, cannot be recovered under contract principles on these facts. Thus, even if Jennings were able to establish a breach of the implied covenant, summary judgment is appropriate for the Nathansons as to Count II of her Complaint.

### F. Fraud and Deceit

■ Under Massachusetts law, in an action for fraud and deceit, "a plaintiff must show that the [(1)] defendant made a false representation of a material fact [(2)] with knowledge of its falsity [(3)] for the purpose of inducing the plaintiff to act thereon ... [(4)] that the plaintiff relied upon the representation as true and [(5)] acted upon it to his damage." *Rogers v. Nstar Elec.*, 389 F.Supp.2d 100, 108 (D.Mass.2005) (Lindsay, J.) (citation and internal quotation marks omitted). According to Jennings, "[the Nathansons'] entry into the Agreement for Judgment followed by their actions to avoid the Agreement for Judgment was the legal equivalent of a misrepresentation of fact." Pl.'s Summ. J. Mem. at 11.

■ Specifically, Jennings claims, "[t]he material fact was the implied premise that the [Nathansons] were entering into the contract in good faith and intended to be contractually bound, which, by [their] actions, was later confirmed to be a false representation." *Id.* Jennings' fraud and deceit claim cannot survive. Even viewing the facts in the light most favorable to her, there is simply no evidence permitting the inference that the Nathansons made knowingly false statements (implied or otherwise) by entering into the Agreement for Judgment. Assuming that the Nathansons did make "implied" statements of their intent to be bound, Jennings' argument that the falsity of such statements can be inferred from their subsequent breach would collapse every breach of contract claim into a claim for fraud. Jennings cites no case law for this unorthodox theory, and this Court rejects it. Summary judgment therefore is warranted for the Nathansons as to Count III of Jennings' Complaint.

### G. Intentional Infliction of Emotional Distress

■ In order to state a claim for intentional infliction of emotional distress, a plaintiff must show: "1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; 2) that the defendant's conduct was extreme and outrageous; 3) that the defendant's conduct caused the plaintiff's distress; and 4) that the plaintiff suffered severe distress." *Anderson v. Boston Sch. Comm.*, 105 F.3d 762, 767 (1st Cir.1997). To be considered extreme and outrageous so as to satisfy the second element, the defendant's conduct must be "beyond all bounds of decency and ... utterly intolerable in a civilized community." *Sena v.*

*Commonwealth*, 417 Mass. 250, 264, 629 N.E.2d 986 (1994) (internal quotation marks and citation omitted) (alteration in original).

 According to Jennings, the Nathansons' June 2003 proposal to resolve the guardianship appeal in exchange for more of Mrs. Nathanson's assets demonstrates how they "used [her] personal and emotional suffering . . . to increase their financial demand . . . ." Compl. ¶ 58; *see also* Pl.'s Summ. J. Mem. at 12 (arguing that the Nathansons "prey[ed] upon [Jennings'] emotions in the hope that [she] w[ould] relent to increased financial demands"). Jennings maintains that such conduct was extreme and outrageous. *Id.* ¶¶ 62–63. As discussed above, Jennings cannot establish a causal connection between the Nathansons' conduct and the distress she endured as a result of probate court's failure to appoint her as guardian. Thus, the only emotional distress relevant to this claim is that resulting from (1) the Nathansons' September 2002 failure to support Jennings' request to be guardian as promised and (2) the Nathansons' June 2003 proposal to support her appointment in exchange for more of Mrs. Nathanson's assets.

By June 2003, the parties no doubt understood that regardless of any agreement reached among them, Jennings' appointment as guardian was by no means a foregone conclusion.[7] Thus, even by Jennings' own account, it was not the guardianship of Mrs. Nathanson itself that the Nathansons dangled before her in their June 2003 proposal, but rather an offer to request her appointment as such. As matter of law, this Court concludes that such conduct, while unsavory, does not rise to the level of being extreme and outrageous.

---

7. Indeed, the probate court expressly ruled that even if the Nathansons supported Jennings' appointment, it would not change the

Accordingly, Jennings' intentional infliction of emotional distress claim cannot survive, and summary judgment shall enter in favor of the Nathansons as to Count IV of Jennings' Complaint.

## III. CONCLUSION

Accordingly, the Nathansons' Motion for Summary Judgment [Doc. No. 4] is ALLOWED. Jennings's Cross–Motion for Summary Judgment [Doc. No. 10] and Motion for Sanctions [Doc. No. 13] are DENIED. Judgment shall enter for the Nathansons.

SO ORDERED.

fact that she was unsuitable for the position. R.App. at 0263–64.